IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| TAHINA CORCORAN, )<br>   as Next Friend on behalf of )<br>   Joseph E. Corcoran, )<br>       Plaintiff , )<br>       )<br>v. )<br>   )<br>CHRISTINA REAGLE, )<br>   Commissioner, Indiana Dept. of )<br>   Corrections, )<br>   )<br>ANNA QUICK, )<br>   Chief Legal Officer, Indiana Dept. )<br>   Of Corrections, )<br>   )<br>RON NEAL, )<br>   Warden, Indiana State Prison, )<br>       Defendants. ) | Case No. 24-2165<br>**DEATH PENALTY CASE**<br>**EXECUTION SCHEDULED**<br>**DECEMBER 18, 2024,**<br>**BEFORE THE HOUR OF SUNRISE** |

**COMPLAINT UNDER 42 U.S.C. § 1983**

**INTRODUCTION**

1. Joseph Corcoran has been convicted of capital murder in Allen County, Indiana, and the State of Indiana has scheduled his execution to occur on December 18, 2024, between midnight and sunrise.

2. Mr. Corcoran is a lifelong practicing Christian who meets regularly with his spiritual advisor, Reverend David Leitzel, a Wesleyan minister. Rev. Leitzel's relationship with Mr. Corcoran spans decades from when Mr. Corcoran was a child to now. Mr. Corcoran has requested that the State of Indiana provide a religious accommodation during his execution allowing Rev. Leitzel to "be present in the execution chamber with a Bible, be permitted to pray with Mr. Corcoran, and be permitted to have limited physical contact with Mr.

1

Corcoran by placing a hand on his shoulder or holding his hand until the execution is complete." *See* Corcoran's Accommodation Request Letter, Attached as Exhibit A.

3. But despite unambiguous precedent for allowing spiritual advisors to be with inmates in the execution chamber at the time of their death as required by the Religious Land Use and Institutional Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq., (*see e.g.*, *Dunn v. Smith*, 141 S. Ct. 725 (2021); *Ramirez v. Collier*, 595 U.S. 411 (2022)), the Indiana Department of Correction ("IDOC") rejected Mr. Corcoran's request because under "Indiana Code Section 35-38-6-11,[1] all persons assisting the Warden with an execution are to remain confidential and anonymous" and IDOC "will not permit an outside person in the death chamber, as the safety, security and secrecy of those staff could be compromised." *See* IDOC Religious Accommodation Rejection Letter, Attached as Exhibit B.

4. The logical extension of the IDOC's denial is that spiritual advisors are banned from the execution chamber for all who are to be executed because presumably, the IDOC's concerns about safety, security and secrecy would be present during all executions. By precluding all spiritual advisors from being present in the execution chamber, the IDOC violates the First Amendment's Establishment and Free Exercise Clauses because the policy inhibits the practice of religious beliefs for those who are religious. *See Larson v. Valente*, 456 U.S. 228, 244 (1982), and *Comm. for Public Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 788 (1973) (noting that, to maintain an attitude of neutrality toward religion, government cannot "advance" or "inhibit" religion).

5. Mr. Corcoran seeks relief under 42 U.S.C. § 1983 to ensure he is executed only in a manner that does not substantially burden the exercise of his religious beliefs and does not violate

---

[1] The IDOC cites Indiana Code Section 35-38-6-11 which does not exist. Undersigned counsel assumes the IDOC intended Indiana Code Section cite should be 35-38-6-1.

his rights under the RLUIPA or the First Amendment's Establishment and Free Exercise Clauses.

## JURISDICTION

6. This Court had jurisdiction under 42 U.S.C. §§ 2000cc-1, 28 U.S.C. §§ 1343, 1651, 2201 and 2202, and under 42 U.S.C. § 1983.

## VENUE

7. Defendant Anna Quick, the Chief Legal Officer for the Indiana Department of Corrections, denied Mr. Corcoran's religious accommodation request. *See* Exhibit B. Defendant Christina Reagle is the Commissioner of the IDOC. Because the Indiana Department of Corrections is headquartered in Indianapolis, Indiana, venue lies in this Court because this is the judicial district "in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1).

## PARTIES

8. Petitioner Tahina Corcoran is Joseph Corcoran's wife, and she acts here as his next friend.[2] Joseph Corcoran is an Indiana prisoner incarcerated under sentences of death at the Indiana State Prison, 1 Park Row Street, Michigan City, Indiana. His execution is scheduled for December 18, 2024, between the hours of midnight and sunrise.

---

[2] Tahina Corcoran is Joseph Corcoran's wife. She litigates this action on his behalf as next friend petitioner because Mr. Corcoran's paranoid schizophrenia, which manifests in delusions and hallucinations, renders him incompetent and incapable of litigating such an action on his own behalf. Mrs. Corcoran will shortly be litigating Mr. Corcoran's incompetency to be executed under *Ford v. Wainwright* and *Panetti v. Quarterman* in the United States District Court for the Northern District of Indiana.

9. Defendant Anna Quick is the Chief Legal Officer of the IDOC, Indiana Government Center – South, 302 W. Washington Street, Indianapolis, Indiana. She is sued in her official capacity.

10. Defendant Christina Reagle is the Commissioner of the IDOC, Indiana Government Center – South, 302 W. Washington Street, Indianapolis, Indiana. As Commission of the IDOC, she is responsible for the management of all Indiana correctional institutions. She is sued in her official capacity.

11. Defendant Ron Neal is the Warden at Indiana State Prison, 1 Park Row Street, Michigan City, Indiana, and is responsible for ending Mr. Corcoran's life. He is sued in his official capacity.

## PROCEDURAL HISTORY

12. On May 22, 1999, an Allen County jury found Mr. Corcoran guilty of four counts of murder, and on May 25, 1999, recommended a sentence of death on each count. On direct appeal, the Indiana Supreme Court reversed his death sentences and remanded to the Allen Superior Court for resentencing. *Corcoran v. State*, 739 N.E.2d 649 (Ind. 2000). The trial court reimposed the death sentences, and the Indiana Supreme Court affirmed. *Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002).

13. In state post-conviction proceedings, Mr. Corcoran initially refused to sign the post-conviction petition counsel prepared and waived post-conviction review because he wanted to be executed to gain relief from the pain caused by the delusions he suffers as a person with paranoid schizophrenia. After three experts testified at a 2003 competency hearing that Mr. Corcoran was not thinking rationally or logically (and was incapable of doing so because of his paranoid schizophrenia) and was out of touch with reality, the post-

conviction court nevertheless found him competent to waive his appeals, a decision upheld by the Indiana Supreme Court. *Corcoran v. State*, 820 N.E.2d 655 (Ind. 2005)(Rucker, J., dissenting). Mr. Corcoran later changed his mind and requested to file a petition for post-conviction relief, but the court dismissed the petition as untimely. Over a dissent, the Indiana Supreme Court affirmed. *Corcoran v. State*, 845 N.E.2d 1019 (Ind. 2006).

14. Mr. Corcoran filed a federal habeas corpus petition in the U.S. District Court for the Northern District of Indiana (INND Case No. 3:05-cv-00389-JD). That court granted relief on a Sixth Amendment claim. *Corcoran v. Buss*, 483 F. Supp. 2d 709 (N.D. Ind. 2007). The Seventh Circuit Court of Appeals reversed the district court's judgment on the Sixth Amendment claim but failed to address the other habeas claims. *Cocoran v. Buss*, 551 F.3d 703 (7th Cir. 2008). Of note on the competency question, Judge Williams of the Seventh Circuit noted, "No one contests that Corcoran suffers from a mental illness." *Corcoran v. Buss*, 551 F.3d 703, 714 (7th Cir. 2008) (Williams, J., dissenting).

15. The Supreme Court then granted certiorari and vacated the Seventh Circuit's judgment, finding that the Seventh Circuit erred when it did not address any other claim except for the Sixth Amendment claim. The Supreme Court remanded to the Seventh Circuit. *Corcoran v. Levenhagen*, 558 U.S. 1 (2009) (per curiam).

16. On remand, the Seventh Circuit considered the other claims in Mr. Corcoran's habeas petition. The court found that the trial court had considered non-statutory aggravating circumstances in sentencing Mr. Corcoran to death, granted relief, and remanded to the trial court for resentencing. *Corcoran v. Levenhagen*, 593 F.3d 547 (7th Cir. 2010). The State petitioned the Supreme Court for certiorari, which the Court granted. The Court vacated

the Seventh Circuit's grant of relief and remanded for further proceedings. *Wilson v. Corcoran*, 562 U.S. 1 (2010) (per curiam).

17. On remand, the Seventh Circuit reinstated its opinion issued in *Corcoran v. Buss*, 551 F.3d 703 (7th Cir. 2008), and remanded to the district court to consider Mr. Corcoran's remaining habeas claims. *Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011). The district court subsequently denied Mr. Corcoran's habeas petition in full. *Corcoran v. Buss*, No. 3:05-cv-389-JD (N.D. Ind. Mar. 27, 2013). The Seventh Circuit affirmed, *Corcoran v. Neal*, 783 F.3d 676 (7th Cir. 2015), and the Supreme Court denied certiorari. *Corcoran v. Neal*, 577 U.S. 1237 (2016).

18. Almost a decade later, on June 26, 2024, the State filed a motion to set Mr. Corcoran's execution date. The Indiana Supreme Court set December 18, 2024, as that date, stating "the Court finds there is no stay of execution now in effect and the only issue properly before us is our administrative task to set an execution date under Indiana Code section 35-5-2-9(h) and Indiana Criminal Rule 6.1(G)(1)." *Corcoran v. State*, No. 24S-SD-222 (Order dated 9/11/24). The Court noted that while they believed setting an execution date was an "administrative task" based on the State's "Motion to Set Execution Date" and they could not consider claims not based on "previously undiscovered evidence," Mr. Corcoran could still "raise constitutional claims through a successive petition for post-conviction relief under Post-Conviction Rule 1(12), or raise challenges to an execution protocol through a civil lawsuit." *Id*.

19. Since the Indiana Supreme Court set his execution, Mr. Corcoran has filed lawsuits challenging the death sentence.

20. On October 24, 2004, Mr. Corcoran filed in the Allen County Superior Court a Motion for Relief from Judgment pursuant to Indiana Trial Rule 60(b)(Allen Superior Court Case Nos. 02D04-0502-PC-000012 and 02D04-9707-000465).  In his motion, Mr. Corcoran sought to revive his original state motion for post-conviction relief which the post-conviction court struck down because it was not signed or verified by Mr. Corcoran.  He also sought to revive a second post-conviction motion which Mr. Corcoran did sign and verify, but the post-conviction court dismissed because it was filed out of time.  Thus, the post-conviction court's decisions completely deprived Mr. Corcoran of state post-conviction process.  To support his Motion for Relief from Judgment, Mr. Corcoran noted a recent change in Indiana law which does not require a post-conviction motion to be signed and verified.  *See Isom v. State*, 170 N.E.3d 623, 632 (Ind. 2021).  On December 2, 2024, the Allen County Superior Court denied Mr. Corcoran's Motion for Relief from Judgment.  On December 5, 2024, Mr. Corcoran appealed the Superior Court's decision, and on December 6, 2024, he filed a Motion to Stay his execution.  The appellate court ordered the State to respond to the Motion to Stay by December 9, 2024.

21. On November 15, 2024, Mr. Corcoran sought permission from the Indiana Supreme Court to file a successive motion for post-conviction relief in the Allen County Superior Court and a proposed successive motion for post-conviction relief arguing that evolving community standards of decency prohibit the execution of those like Mr. Corcoran who are seriously mentally ill (Cause No. 24S-SD-222).  On December 5, 2024, the Indiana Supreme Court denied Mr. Corcoran's request. *Corcoran v. State*, Case No. 24S-SD-222 (Ind. Dec. 5, 2024).

22. On November 15, 2024, Mr. Corcoran presented his competency to be executed claim with supporting exhibits to the Indiana Supreme Court (Cause No. 24S-SD-222). On that same day, he also moved for a stay of execution. On November19, 2024, the Indiana Supreme Court set a briefing schedule. On November 26, 2024, the State filed its response with supporting exhibits. On December 3, 2024, Mr. Corcoran filed his reply in support. On December 5, 2024, the Indiana Supreme Court denied the claim noting the "Court will promptly issue a written opinion explaining its reasons." *Corcoran v. State*, Case No. 24S-SD-222 (Ind. Dec. 5, 2024).   Once the Indiana Supreme Court issues its opinion, Mr. Corcoran will file his competency to be executed claim in federal court.

**FACTUAL BACKGROUND**

23.  Rev. David Leitzel has been the Corcoran family's minister for many years.  He first met Mr. Corcoran's mother, Mrs. Kathryn Corcoran, when she began attending his church, Hamilton Wesleyan Church in Hamilton, Indiana.  It was Kathryn Corcoran who first introduced Mr. Corcoran to Rev. Leitzel when Mr. Corcoran was about twelve years old. *See* Affidavit of David Leitzel, Attached as Exhibit C.   Rev. Leitzel was later the officiant at Kim Corcoran's wedding to her husband Matthew Brown on June 13, 1993.

24. Although Mr. Corcoran was active in the church youth group, Rev. Leitzel observed that he was generally quiet and somewhat socially withdrawn.  He remembers that Mr. Corcoran rarely smiled.

25. When Mr. Corcoran was about fourteen years old and at a church summer camp, Rev. Leitzel remembers that after he had preached a session about relationships with parents, Mr. Corcoran was crying.  When Rev. Leitzel asked Mr. Corcoran about what was

bothering him, Mr. Corcoran confided in Rev. Leitzel, disclosing how his father abused him physically and emotionally.

26. After Mr. Corcoran was arrested for the murder of his parents, Rev. Leitzel did his best to visit Mr. Corcoran at least once a week at the jail. It was during these visits that Leitzel noticed Mr. Corcoran's paranoid behavior. After Mr. Corcoran's acquittal of his parents' murder, Rev. Leitzel's relationship with Mr. Corcoran became more distanced because Mr. Corcoran rarely attended church. But after Mr. Corcoran was arrested for the Fort Wayne murders, Rev. Leitzel again began visiting Mr. Corcoran once a week at the Allen County Jail.

27. It was during the Allen County jail visits, that Rev. Leitzel remembers Mr. Corcoran becoming more spiritual. Most of their conversations centered on the Bible or religion, but Rev. Leitzel also noticed Mr. Corcoran's increasing paranoia about those around him.

28. Rev. Leitzel continues to minister to Mr. Corcoran weekly at Indiana State Prison. Mr. Corcoran has expressed to counsel his desire to have Rev. Leitzel present in the execution chamber, praying with him as he is executed.

29. As written above, Mr. Corcoran through counsel requested a religious accommodation from the IDOC. *See* Exhibit A. Mr. Corcoran requested that Rev. Leitzel be permitted to "be present in the execution chamber with a Bible, be permitted to pray with Mr. Corcoran, and be permitted to have limited physical contact with Mr. Corcoran by placing a hand on his shoulder or holding his hand until the execution is complete." Citing "Indiana Code Section 35-38-6-11," the IDOC rejected Mr. Corcoran's request due because "an outside person" in the death chamber "could" compromise the safety, security and secrecy of staff.

30. It is not disputed that Mr. Corcoran suffers from paranoid schizophrenia. PCR R. 242. His symptoms include the delusion that prison guards use a secret ultrasound device to bombard him with invisible and inaudible sound waves which cause him physical pain and emotional turmoil. Mr. Corcoran recently published a book, *Electronic Harassment: A Whistle-blower Report*, in which he expounds on the scientific plausibility of his belief that he is being tortured with sound waves. Given his delusional state, counsel for Mr. Corcoran are challenging his competency to be executed under the legal standards espoused in *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Panetti v. Quarterman*, 551 U.S. 930 (2007).

31. Mr. Corcoran has not utilized the prison grievance process to request Leitzel's presence in the execution chamber. Even if he were competent to do so, the effort would be futile given IDOC's response to his religious accommodation request occurred on December 2, 2024.

## CLAIMS FOR RELIEF

32. Mr. Corcoran re-alleges and incorporates herein by reference all the allegations contained in the proceeding paragraphs of this Complaint.

### First Claim for Relief:  Establishment Clause

33. The First Amendment to the United States Constitution commands that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This command is binding on the states through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). It is well-settled that the Establishment Clause not only prohibits governmental entities from passing laws that prefer one or more religions over others, but also those that demonstrate a hostility toward religion. *See*

*Larson v. Valente*, 456 U.S. 228, 246 (1982); *Zorach v. Clauson*, 343 U.S. 306, 313-15 (1952); *Everson v. Bd. of Ewing Twp.*, 330 U.S. 1, 15 (1947) ("Neither a state nor the Federal Government . . . can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.").

34. By precluding all spiritual advisers from being present in the execution chamber, which the IDOC justifies based on a statutory requirement of secrecy, Defendants violate the Establishment Clause because the policy penalizes only those who based on their sincere religious beliefs wish to have a spiritual advisor present in the death chamber and because it inhibits the practice of religious beliefs. *See Comm. for Public Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 788 (1973) (noting that to maintain an attitude of neutrality toward religion, government cannot advance or inhibit religion). Thus, the IDOC demonstrates a hostility toward religion.

35. A policy that is not neutral between religion and non-religion, like that of the IDOC, is inherently suspect. *See Larson*, 456 U.S. at 246. Such a policy may only be upheld if it passes strict scrutiny – in other words, if it is narrowly tailored to a compelling interest. *Id.* at 246 – 47.

36. For its compelling interest, the IDOC cites a statutory provision, Indiana Code Section "35-38-6-11"[3], which designates certain information as "confidential" including "the identity of an officer, an employee, or a contractor of a person described in subdivision (1)." I.C. § 35-38-6-1(f)(2). The statute mentions nothing about safety and security as referenced in the rejection letter. *See* Exhibit B.

---

[3] Again, Indiana Code Section 35-38-6-11 does not exist. Counsel assumes the IDOC meant to rely on Section 35-38-6-1.

37. That a spiritual advisor in the death chamber "could" compromise secrecy is a speculative justification that does not pass strict scrutiny. *See Kennedy v. Bremerton School Dist.* 597 U.S. 507, 543 (2022) (the "mere shadow" of a conflict does establish competing interests are at odds); *see also Gutierrez v Saenz*, No. 1:19-cv-00185, slip op. at 29 (S.D. Tex. Nov. 24, 2020) (holding in a case where the Texas Department of Criminal Justice instituted a policy barring all spiritual advisors from the execution chamber that "the extensive evidence submitted by [the Texas Department of Criminal Justice] *does not demonstrate that serious security concerns would result* from allowing inmates the assistance of a chosen spiritual advisor in their final moments. Speculative hypotheticals without evidentiary support do not create an unmanageable security risk." (emphasis added)).

38. The IDOC offers no explanation of its attempts to ameliorate the situation by taking measures to ensure secrecy and security even with a spiritual advisor in the chamber. Without such an explanation, the IDOC's blanket refusal to allow spiritual advisors in the execution chamber is overbroad and is not narrowly tailored to achieve the objective without violating the Establishment clause. Moreover, the Supreme Court has already found these types of categorical bans to *not* be the least restrictive means of protecting the government's interest in safety. *Ramirez*, 595 U.S. at 429-32. Indeed, *every* other state that actively carries out executions as a policy matter allows spiritual advisors to be present, physically touch, and talk quietly with their spiritual charge as they are dying.

### Second Claim for Relief:  Free Exercise of Religion

39. The First Amendment also commands that "Congress shall make no law . . . prohibiting the free exercise of" religion. U.S. Const. amend. I. Like the Establishment Clause, the

Free Exercise Clause is binding on the states through the Fourteenth Amendment. *See Cantwell*, 310 U.S. at 303.

40. The IDOC policy will prohibit Mr. Corcoran's free exercise of his Christian faith in the crucial moments leading to his passage to the afterlife. The level of scrutiny to be applied when reviewing policies that hinder an individual's ability to freely exercise his religion depends on whether the law is neutral and generally applicable. *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993). A law that is "neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* A law that does not satisfy both requirements "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.; see also Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 643 (2018).

41. Here, like above, IDOC offers no explanation of its attempts to ameliorate the situation by taking measures to ensure secrecy even with a spiritual advisor in the chamber. And its blanket refusal should not be considered narrowly tailored without further explanation. *See Lukumi* at 547 (city ordinance banning all ritual sacrifices was not narrowly tailored to achieve legitimate governmental interests in protecting health and cruelty to animals). Moreover, the Supreme Court has already found these types of categorical bans to *not* be the least restrictive means of protecting the government's interest in safety. *Ramirez*, 595 U.S. at 429-32. Indeed, *every* other state that actively carries out executions as a policy matter allows spiritual advisors to be present, physically touch, and talk quietly with their spiritual charge as they are dying.

### Third Claim for Relief: RLUIPA

42. Congress enacted the RLUIPA "to provide very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 35, 356–57 (2015). Indeed, the RLUIPA grants "expansive protection for religious liberty" and affords inmates with "greater protection" than the relevant First Amendment precedents. *Id.* at 358, 361.

43. Under RLUIPA, government and state entities may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution even if the burden results from a rule of general applicability" unless the entity shows that the imposition of the burden both is in furtherance of a compelling governmental interest and is the least restrictive means of furthering said interest. 42 U.S.C. § 2000cc-1(a) (2000).

44. "Religious exercise" under the RLUIPA is defined broadly as "any exercise of religion whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see Dunn*, 141 S. Ct. at 725 (Kagan, J., concurring) (requiring Alabama to allow a spiritual advisor to pray with and lay hands on inmate Willie Smith during his execution because "Smith understood his minister's presence in the execution chamber as integral to his faith and part of his spiritual search for redemption.").

45. A plaintiff raising a claim under RLUIPA bears the initial burden of making a prima facie case that a prison practice substantially burdens his sincere religious exercise. *West v. Radtke*, 48 F.4th 836 (7th Cir. 2022). A substantial burden on religious exercise occurs when a prison attaches some meaningful negative consequence to an inmate's religious exercise, forcing him to choose between violating his religion and incurring that negative consequence. *Id.* at 845 (relying on *Holt* and *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)).

46. To be sure, there is unambiguous precedent for allowing spiritual advisors to be with inmates in the execution chamber at the time of their death as required by the RLUIPA. *See, e.g., Ramirez v. Collier*, 595 U.S. 411 (2022) (finding that petitioner was likely to succeed on his RLUIPA claims because Texas' policy refusing religious touch and audible prayer in the chamber during the execution burdens religious exercise and is not the least restrictive means of furthering a compelling governmental interest); *Dunn*, 141 S. Ct. at 725–26 (Kagan, J., joined by Breyer, Sotomayor, & Barrett, JJ., concurring in denial of application to vacate injunction) (noting that both Alabama and the United States Federal Government have a history of performing executions with chaplains present in the chamber, that in fact, the "Federal Government has conducted more than 10 executions attended by the prisoner's clergy of choice," and that based on such history, "a prison may ensure security without barring all clergy members from the execution chamber."); *see also Murphy v. Collier*, 139 S. Ct. 1475 (2019) (mem.) (requiring Texas to allow an inmate's Buddhist spiritual advisor or another Buddhist reverend to be present in the execution chamber with the inmate during the execution). *See generally Gutierrez v. Saenz*, No. 1:19-cv-00185, slip op. at 3 (S.D. Tex. Nov. 24, 2020) (citations omitted) (noting that "[b]etween 1982 and March 2019 Texas conducted 560 executions . . . [and] the presence of a chaplain did not cause any security incident during those years.").

47. There can be little doubt that IDOC's policy prohibiting a spiritual advisor in the execution chamber substantially burdens Mr. Corcoran's exercise of his sincerely held religious beliefs which include having his life-long spiritual advisor, Rev. David Leitzel, praying with him as he passes to the afterlife. *See, e.g., Dunn*, 141 S. Ct. at 725 (Alabama's policy substantially burdens the exercise of religion because it bars all clergy

members from the execution chamber, leaving inmates to die without spiritual attendance.).

48. Under the RLUIPA, a prison may not impose a substantial burden on a prisoner's religious exercise unless doing so satisfies strict scrutiny – that is, the challenged policy must be the "least restrictive means of furthering a compelling governmental interest." *Dunn*, 141 S. Ct. at 725. Strict scrutiny is an exceptionally demanding standard under which if any less restrictive means is available for the state to achieve its goals, then they must use it. *Id.* As far as Mr. Corcoran can tell, the IDOC has made no effort at all to achieve their goal of secrecy and security in the least restrictive way, and their blanket refusal of Mr. Corcoran's religious request is completely inconsistent with well-established jurisprudence. *See, e.g., Dunn*, 141 S. Ct. at 726 (a state can take any number of measures to ensure security including doing a background check on the minister, it can interview him and it can seek a pledge that he will obey all rules). The RLUIPA places a heightened duty on prison officials to demonstrate, not to just assume, that a plausible, less restrictive alternative would be effective, something the IDOC apparently fails to recognize. *See id.*

49. Ordinarily, an inmate must exhaust all administrative remedies under the Prison Litigation Reform Act of 1995 ("PLRA") before filing a § 1983 claim under RLUIPA, even in the execution context. *See Ramirez*, 595 U.S. at 422; 42 U.S.C. § 1997e(a). If, however, administrative remedies are not "available," exhaustion is not required. *Ross v. Blake*, 578 U.S. 632, 642 (2016) (an inmate is required to exhaust those, but only those, grievance procedures that are "available," that is "capable of use" to obtain "some relief for the action complained of."); *Booth v. Churner*, 532 U.S. 731, 737 38 (2001). An administrative procedure is unavailable when it operates as a simple dead end – with officers unable to

provide any relief to the aggrieved inmate. *Id.* at 643 (citing *Booth*, 532 U.S., at 736, 738). "Where the relevant administrative procedure lacks *authority* to provide any relief, the inmate has nothing to exhaust." *Ross*, 578 U.S. at 643 (emphasis added). Because the rejection of Mr. Corcoran's case came directly from the highest authority within the department, the Chief Legal Officer of the IDOC, no lower IDOC official would have the authority to grant relief to Mr. Corcoran through the administrative remedy process. Indeed, "when the facts of the ground demonstrate" that no potential for relief exists, "the inmate has no obligation to exhaust the remedy." *Id.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide relief as follows: 1) A declaratory judgment that Indiana Department of Corrections policy violates Mr. Corcoran's rights under the First Amendment's Establishment and Free Exercise Clauses; 2) A declaratory judgment that Indiana Department of Corrections policy violates RLIUPA; and 3) A preliminary and permanent injunction prohibiting Defendants from executing Mr. Corcoran until they can do so in a way that does not violate his rights.

    Respectfully submitted,

*/s/ Laurence E. Komp*
LAURENCE E. KOMP, MO. Bar #40446
FAITH J. TAN, IL. Bar #6342729
MICHELLE M. LAW, MO. Bar #45487
Capital Habeas Unit
Federal Public Defender
Western District of Missouri
1000 Walnut St., Ste. 600
Kansas City, MO  64106
(816) 675-0923
laurence_komp@fd.org
faith_tan@fd.org

michelle_law@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I sent it via email to Mr. Tyler Banks, Supervising Deputy Attorney General, Office of the Indiana Attorney General, at Tyler.Banks@atg.in.gov.

/s/ Laurence E. Komp
Laurence E. Komp, MO. Bar. No. 40446